# EXHIBIT 4

Noel S. Weiss, MD DrPH
18372 Ridgefield Rd NW
Shoreline, WA 98127

To:    Emily Harris Gant

From:  Noel S. Weiss, MD, DrPH

March 9, 2010

I am writing to express my opinion regarding the nature of the scientific evidence that bears on the capacity of proximity to the noise from dental drills to give rise to hearing loss.

I believe I have the training and experience to offer such an opinion. I obtained an MD degree from Stanford University in 1967 and a DrPH degree (Epidemiology and Biostatistics) from the Harvard School of Public Heath in 1971. Since 1973, I have been a faculty member in the Department of Epidemiology, School of Public Health, University of Washington, and also at the nearby Fred Hutchinson Cancer Research Center. At the present time, I hold the rank of Professor. I have authored or coauthored over 500 articles in medical journals, as well as several books. I served as Chair of the Department of Epidemiology for nine years, and for twenty-five years was Principal Investigator of a training grant in cancer epidemiology and biostatistics from the National Cancer Institute. During the course of my career, I have received numerous research grants from the American Cancer Society and the National Institutes of Health. One of these was the Outstanding Investigator Award from the National Cancer Institute, which I received in 1985 and had renewed in 1992.

I have given deposition and trial testimony on a number of occasions. A list of these is enclosed. My fee for legal consulting is $400 per hour. If additional information becomes available to me, I would like to retain the right to supplement this report.

In order to identify relevant data regarding the question at hand, I performed a Medline search, using the search terms "hearing loss" and both "dentists" and "oral surgeons". Of the several dozen articles that came up, there were but a relatively small number that examined the prevalence of hearing loss among dentists (none regarding hearing loss among oral surgeons) and also contained an abstract that permitted assessment of the results of the study.

1. Comm Dent Oral Epidemiol 1988;16: 268-70. In this Finnish study, an audiologic evaluation was performed on 234 dentists and dental assistants. The results: "Ordinary and high frequency hearing as compared to controls showed no significant differences." In a related study (Comm Dent Oral Epidemiology 1989;17:207-11), measurements were made on 68 dentists who had been in practice at least 10 years. Compared to controls, there was no impairment in the speech range. However, at higher frequencies "dentists tended to have higher hearing thresholds than expected".

asbestos_1969.com

2. Zahn Mund Kieferheilkd Zentralbl 1990; 78:735-8. There was, on average, reduced high frequency hearing in dentists compared to age-matched controls. However, "the measured hearing loss remained without social importance in all cases".

3. J Am Dent Assoc 1978; 97:479-82. Based on an audiologic evaluation of 70 dentists, "no statistical decrease in hearing thresholds appeared in either the speech or high frequencies when the dentists were compared with a normal, age-adjusted, population".

4. Br Dent J 1965; 18:206-10. In a group of 70 dentists, who had been in practice for 3-7 years, there was a modest impairment (compared to controls) in the 4 and 6 kilocycle per second regions. The impairment was unnoticed by the dentists and "did not constitute a social handicap".

These studies have some limitations. All examined only dentists currently in practice; conceivably, those who had sustained hearing loss could have abandoned their profession. Relatively few dentists who had been in practice for an extended period were included in the studies. No information was provided as to the actual level of exposure to dental drills. Also, the size of the studies is relatively small, so that a modest influence of drill exposure on hearing could be missed. Nonetheless, collectively their results offer no support for the hypothesis that the noise levels to which dentists are exposed have the capacity to give rise to clinically-evident hearing loss. This opinion jibes with that of Hyson (JADA 2002;133:1639-42) who, in his own review of the literature, felt that in aggregate the results were "inconclusive".

Because very high and/or prolonged noise levels can lead to hearing loss (JAMA 1999;281:1658-9), and because it is impossible for even a series of negative epidemiologic studies to rule out a very small increase in risk, it is possible that dentists do (to a small extent) suffer hearing loss to a greater degree than do other persons. Even if this were the case, however, because of the abundance of other causes of hearing loss - many of which are unknown - an individual dentist with hearing loss most likely would have sustained that loss for a reason unrelated to the noise levels in his/her office. For the sake of argument (and contrary to the available data), assume a 5% increase in the risk of hearing loss among dentists. For every 105 dentists with hearing loss, 100 would have developed this loss for all of the reasons that non-dentists do, whereas for the remaining five, some feature of their occupation would be responsible. For any one of these dentists, there would be only about a 5% chance that his/her hearing loss was occupationally related – far less probable than not.

*Joel All Weiss*

**EXHIBIT 5**

# John E. Hamm, M.D., P.S.

Diplomat American Board Psychiatry
and Neurology
Certified by American Society
of Addiction Medicine

First Hill Medical Building
515 Minor Avenue, Suite 230
Seattle, Washington 98104-2138
Telephone (206) 622-9496

## PSYCHIATRIC EVALUATION

March 19, 2010

Ms. Emily Harris Gant
Attorney at Law
Ogden, Murphy, Wallace
1601 Fifth Ave., Suite 2100
Seattle, WA 98101-1686

RE: Erickson vs. MicroAire
Independent Psychiatric Evaluation of Robert Todd Erickson and Ann Erickson

Dear Ms. Gant:

At your request, I reviewed medical records pertaining to Dr. Robert Todd Erickson, as outlined below. I may be reviewing additional records as they become available. Also, I may be interviewing Dr. and Mrs. Erickson. It is my understanding that you represent MicroAire Surgical Instruments, L.L.C., in relation to Robert Todd Erickson and Ann Erickson's lawsuit contending that MicroAire's dental drills caused Dr. Erickson's hearing loss and tinnitus.

## RECORD REVIEW:

I reviewed the following records provided to me through your office.

1. Deposition of Robert Todd Erickson dated May 7, 2007. There is, in addition, an attached Deposition of Ann Erickson, dated May 8, 2007. Note that these depositions are related to Jennifer M. Forshey, Plaintiff vs. Sound Oral and Maxillofacial Surgery and Robert Todd Erickson and Ann Erickson.

2. Deposition of Robert Todd Erickson dated February 10, 2010.

3. Records from Carl A. Brodkin, M.D., M.P.H., regarding evaluation of Dr. Robert Erickson.

4. Records from Cardiac Health Specialists concerning Robert Erickson.

5. Records from John G. Carrougher, M.D., concerning Dr. Erickson.

6. Records from Family Behavioral Health Center, Dr. Richard Jensen, Ph.D.

7.      Records from Gig Harbor Multicare Clinic, regarding Robert Todd Erickson.

8.      Records from Harbor Audiology and Hearing Services regarding Dr. Erickson.

9.      Records from Neurosurgical Consultants of Washington in Seattle concerning Dr. Erickson.

10.     Records from Rhonda Savage, D.D.S., concerning Dr. Erickson.

11.     Records from Mary Simonson, M.D., concerning Dr. Erickson.

12.     Records from Dr. Mark Taylor related to treatment of Dr. Erickson.

13.     Records from Tacoma Ear and Balance Clinic, Dr. Charles Souliere, Jr., M.D., concerning treatment of Dr. Erickson.

14.     Records from Chicago Dizziness and Hearing Clinic, Chicago, Illinois, concerning Dr. Erickson.

15      Deposition of Mark Cardwell, M.D., dated April 17, 2007.

16.     Statement of Charges, State of Washington Department of Health, Dental Quality Assurance Commission in the Matter of the Licensed Practices of Dentists of Robert T. Erickson., dated May 15, 2006; Amended Statement of Charges, State of Washington Department of Health, Dental Quality Assurance Commission, dated May 27, 2007; Stipulated Findings of Fact and Conclusions of Law and Agreed Order, dated November 9, 2007; and attached Order of Completion of Conditions from the Department of Health, Dental Quality Assurance Commission, dated May 15, 2009.

17.     Peter F. Hampl D.D.S. Report dated March 17, 2010.

18.     Treatment recorts from Karin Nussbaum, Ph.D. December 11, 2009 to February 15, 2010 regarding Dr. Erickson.

19.     Industrial Hygiene Report by James C. Rock, Ph. D. dated March 19, 2010.

20.     Excerpts from lawsuit entitled Forshey vs. SOMS PS et al.

21.     Excerpts from epidemiological report of Dr. Noel Weiss.

22.     Excerpts from Dr. Erickson's file with the Dental Quality Assurance Commission.

23.     I may be reviewing additional data that may affect my opinions as outlined below.

**FURTHER RECORD REVIEW:**

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 3

1.  I reviewed the deposition transcript of Robert Todd Erickson dated May 7, 2007.  Dr. Erickson, in his deposition, noted that he had an oral and maxillofacial surgery practice. He depended on referrals from area dentists.  He had referrals in the Tacoma and Gig Harbor area from dentists.  In 2004, he had about 350 to 400 dentists referring to him. Dr. Erickson had associates in his practice.  He employed Dr. Forshey.  His wife also participated in the practice.  The practice was located in Gig Harbor, Washington.  There had been some problems with Dr. Forshey in the practice concerning her marketing and staff relations and emotional outbursts.  There were concerns about her clinical performance.  She was felt to have a "lackadaisical effort" regarding marketing. Eventually, Dr. Erickson terminated Dr. Forshey.  There had been omissions in documentation regarding patient charts.  There had been problems with her following medical protocol.  She did not handle criticism well.  She had worked for him in 2004 about 25 weeks.

There was a concern about a "licensure issue" from the Department of Health dated October 11, 2005.  There is a notation about an "attempted extortion" by Dr. Forshey.

I next reviewed the attached Deposition transcript of Ann Erickson, May 8, 2007.  In reference to Dr. Forshey's employment, it was discussed that there was some concern that Dr. Forshey would bring a lawsuit against them if terminated.  Ms. Erickson opined that there were hundreds of thousands of dollars in undercharges that Dr. Forshey was responsible for.  She failed to charge patients.

2.  I next reviewed the deposition of Robert Todd Erickson, February 10, 2010, related to Todd and Ann Erickson, plaintiffs vs. MicroAire Surgical Instruments.  Dr. Erickson noted that he was "hearing impaired."  He made reference to the prior lawsuit with Dr. Forshey that ended in a "settlement."

Dr. Erickson noted that he lives in Gig Harbor, Washington, in the same home for four years.  He has been trying to sell the house.  He is residing in Chicago at the date of the deposition, February 10, 2010.  He had been living in Chicago since September 2009.  He is involved in a fellowship that lasts about 12 months.  He is applying to law school and "trying to move on with a career."  He was in the process of making applications to law schools.

He noted that his wife had been his business partner both in the dental practice, and she helped to build or design their home projects.  They have a son who is interested in golf, and they moved to the Canterwood Golf and Country Club area.  Their son is living with his grandparents in Tucson, Arizona, in order to play in golf tournaments.  His wife is with him in Chicago and visits their son in Tucson.  The Chicago location was due to Dr. Erickson's education.  They lived in Florida for a few months prior to his moving to Chicago for his son's golf training.  Regarding Dr. Erickson's future, he stated that was unknown, and it depended on where he might get into law.

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 4

He described that he and his wife had been married for 18 years. They have one son. His wife had been previously married twice. He had not. His wife has an R.N. degree. She was working on her M.B.A. degree.

He stated that he had to sell his practice and discontinued the practice because of his hearing loss. He was unable to practice oral maxillofacial surgery. He attended Pacific Lutheran University. He went on for training in dentistry in maxillofacial surgery. He completed parts of the American Board of Oral and Maxillofacial Surgery, but had not taken part two. He did not have enough hospital cases to take that part. He did not have any restrictions in his hospital privileges or practice.

He stated that he became aware that the noise could cause his hearing loss when he was diagnosed with it in May 2006 or 2007. "Dates are all a blur." He used to wear earplugs starting around 1997 when he mowed the lawn. He did not recall if he wore hearing protection when he hunted with his father. He also later worked for his father in his father's general dentistry office. He did his general practice residency in Omaha, Nebraska, at Creighton University. He worked at Cascade Oral Surgery. He described the equipment they used.

Dr. Erickson discussed his private practice in Tacoma and Gig Harbor locations. He had had about ten employees. The Gig Harbor office opened in 2004. He sold the practice on April 26, 2007. He worked at Gig Harbor two days a week and Tacoma three days a week. He stated that his practiced grossed between $100,000 and $160,000 per month. He started using MicroAire drills early on in his practice. He had both pneumatic and electric drills, but predominantly used the pneumatic. He wore a stethoscope to monitor the patients. Dr. Erickson described how he had had problems with the MicroAire drills "all the drills would break down and need some kind of repair. It was more routine. It was not like what I was experiencing before. Somehow they figured out that some of these drills were defective." They were replaced, and they continued to use MicroAire drills.

In discussing his problems in the deposition, he stated that he first noticed a problem with tinnitus in January 2006. It became bilateral at that time. It was symmetric. He remembers his wife shaking him in bed and telling him that he had not responded to the alarm going off. He made an appointment in February 2006 to see a neurosurgeon, Dr. Lazar. He was concerned about possible brain tumor. He had an MRI in April 2006. This was negative. He then saw an Ear Nose and Throat (ENT) doctor, Dr. Souliere. He stated that he was told he had a noise-induced hearing loss. He recommended that Dr. Erickson be fit for custom hearing protection devices. He continued to work. He was working full time in March 2007. He was getting tired and concerned about his performance. He limited his evaluations and surgeries. He was still using the pneumatic drills in March 2007, but wearing hearing protection. He tested other drills and could not find any electric drills that did not hurt his ears. He contacted the Department of Labor and Industries complaining about the decibel levels of the drills.

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 5

He stated that he was present in the office with his wife when Mr. Spann came out to do an investigation and testing. Mr. Spann monitored the devices. He stated that he tested other devices and could not find any others that work for him. He thought it was impractical to wear earplugs. He stated that it was his understanding that the ears would not be damaged with drills that have decibels below 70, and he was advised to use the quietest drill possible, and not to use a drill that produces a sound above 85 decibels.

Dr. Erickson noted that the drills that he had used in general dentistry and training did not operate at the decibel level that causes injury, and he was not exposed to those drills long enough to cause hearing loss. He stated that when he got into his own private practice and built it up to the busy practice he was exposed to a higher decibel level for longer duration.

He had seen a Dr. Fahmey, Cardiologist, for treatment in the past. He had had a dysrythmia. He also has had migraine headaches. When he has a migraine headache, he has an aversion to loud sounds. He then clarified that he had the aura of a migraine headaches, which is photophobia, and does not affect his hearing. He has sonaphobia in general, and if he has a migraine it does not change the character or make it worse. His complaint with the migraine has always been photophobia, not sonaphobia.

He described the problems that he had. He was having problems with hearing and problems with tinnitus. With the hearing problem, he stated that there was a loss of day-to-day functioning. He was using a hearing aid. He did not hear conversations well. There was background noise, and this bothered him. He noted that he would have to have people repeat things or speak louder. This was embarrassing and frustrating. It affected his ability to relate to people. He stated that the tinnitus was loud. It was ringing constantly. He was told there was no treatment for it, and it affected his ability to concentrate. He had trouble studying for the LSAT test that he had taken a couple of days prior to the deposition. It has affected his ability to focus and concentrate. Dr. Erickson noted that it was his understanding that he had damaged the hair cells in his ears and the acoustic center in his brain, and that he had to constantly expend energy to override those stimuli. He had a disrupted sleep pattern and by the end of the week would feel exhausted. He noted that he got depressed and angry and took it out n his wife and son and was very difficult to be around. For a while he was in denial and then later sought counseling. He started medication. He has tried different medications at different doses. He takes sleep medication. He stated that he had lost his profession and his identity and ability to make an income. He stated that it could have been avoided "with proper warnings, with proper notice from MicroAire. Proper engineering of the drill, in my mind, would have prevented this. So my life has been turned upside down." He stated it is his understanding that his hearing loss will deteriorate. The tinnitus is not predictable. He uses a white noise machine in his bedroom at night for the tinnitus. He has purchased a hearing aid for the hearing loss. He has to turn up the TV louder to hear it.

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 6

He states that he is using Fluoxetine "just not get so agitated." He is also taking Clonazepam that is supposed to help with his sleep, and helps him get through the night, and it has a "moderate effect. It helps a little bit." He was seeing a psychiatrist to manage his medication. He is seeing a Ph.D. counselor. He stated that he is going through stages of anger, and he is finally working on acceptance. He has been referred to an audiologist who specializes in tinnitus. He has used an "i-pod" with special music to help block the tinnitus. He also states that he has been increasing exercise to deal with depression. It helps him sleep better.

His psychiatrist is Dr. Tom Allen. The counselor is Ms. Karen Nussbaum. His primary care provider is Dr. Cohen in Chicago. Dr. Cherchi treats him for his hearing loss and tinnitus.

He stated that he sold his practice for $950,000. At the time of the deposition, he was a Hillenbrand Fellow at the ADA and he got a stipend for that. The Hillenbrand is about $75,000 a year. He also gets $15,750 a month disability.

He sees Dr. Allen once every six weeks and his counselor up to once a week.

When asked about malpractice claims, he stated that he had a claim against him to the Dental Quality Assurance Commission (DQAC) and it was dismissed. This was in July of 2007. He was reported to the DQAC. He thinks the complaint was made by Dr. Forshey. There was a stipulated order that he was to pay a fine of $5,000 within 18 months, but he did not pay any fine. He had already sold his practice.

He noted that he terminated Dr. Forshey from his practice. She was endangering the health of his patients and was a rough and unskilled surgeon. She was discharging patients without postoperative evaluation and not monitoring the patients. She was not monitoring the prescriptions and not doing marketing. She would say negative things about Dr. Erickson and his wife to staff.

3.   Records of Carl A. Brodkin, M.D., M.P.H. Dr. Brodkin performed examination August 21, 2009. He noted that Dr. Erickson had bilateral tinnitus, constant, without change and it continued to interfere with speech comprehension and sleep. He had worsened subjectively over the previously year. He had trouble with background noises in public places and high-pitched noises, including telephone rings and smoke alarms. He had to turn up the television to comprehend the speech. He continues to use a hearing aid. He had difficulty adjusting to hearing loss with irritability, frustration, and feelings of helplessness. He was being treated for depression by a Dr. Simonson with improved symptoms on Prozac and Lexapro. Included in the records are an "ADA News Today" and an announcement posted July 14, 2009, regarding Dr. Robert Todd Erickson being chosen for Hillenbrand Fellow. He was to work at the ADA headquarters. He was introduced to a career in non-clinical aspects of dentistry. He noted, "This is like a dream come true. There is so much I want to do. I really want to give back."

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 7

I note another examination on August 15, 2008, by Dr. Brodkin. His opinion was that Dr. Erickson's inability to communicate effectively with staff and monitor patients under anesthesia resulted in concern for patient safety. He went on disability after discontinuing his practice in April 2007. He noted that Dr. Erickson had experienced concern and frustration associated with a hearing loss and tinnitus and the impact on his work activities. He had poor sleep from tinnitus and experienced difficulty concentrating during the day with irritability and had partial improvement with the Fluoxetine.

4.  I next reviewed the records from Cardiac Health Specialists. Dr. Erickson was seen in 2003 for problems with palpitations. There was minimal tricuspid regurgitation and clinically insignificant mitral regurgitation. He had some isolated monoformic premature ventricular contractions. It was recommended that he use prophylactic antibiotics prior to dental or GU/GI procedures. He was about 41 years old when the problems began. Previous medical history had included gastro esophageal reflux disease and hernia repair. He took occasional Nexium and some aspirin.

5.  I reviewed the records of John C. Carrougher, M.D. He had seen Dr. Carrougher in June 2002 for gastrointestinal study and was noted to have a normal upper GI.

6.  I next reviewed the Family Behavioral Health Center records including notes by Dr. Richard Jensen, Ph.D. He had "private consultation" from September 5, 2007, through December 4, 2007. He took the Beck Depression Inventory at that time. Items endorsed led a score of nine. (It is noted that a mean score of 10.9 is in a non-depressed level.) The items endorsed were "I don't enjoy things the way I used to, I'm disappointed in myself, I'm critical for myself for my weaknesses or mistakes, I don't sleep as well as I used to, I am less interested in sex than I used to be." There is also an item related to "being more irritated than usual." He also indicated some items on the BSI indicating that he got annoyed or irritated easily and had some temper outbursts, arguments, tenseness, some trouble concentrating, and difficulty making decisions. Handwritten notes beginning September 10, 2007, indicate that he began to experience some sensory hearing loss in January 2006 and had become disabled as a result of the hearing loss and tinnitus. He was angry at the loss of his profession and lost confidence and "now I'm nothing." He said that his income had been affected. He was getting angry quickly. He was started on Prozac 20 mg and then it boosted to 40 mg and had side effects, but decided to start the Prozac again. He stated that he came from a family that did not talk about problems or emotions. His father was a "functional alcoholic." When he used alcohol, he would get angry. Diagnosis was 309.28 with a GAF scale score of 60 (Adjustment disorder with mixed emotional features). His parents were described as "very stoic." There were no physical displays of affection or verbal expression of emotion. He had a speech impediment when he was a child and was shy. He developed slowly. "Looking back felt angry and frustrated." Feels it was venting anger called "wrecker." Introduced to alcohol at 15. His parents did not notice. He suffered socially and was behind. He went to PLU and there was "lots of alcohol use." He did not perform up to his abilities. He got more serious in his junior year. He went to Creighton

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 8

Dental School and did well. He got a girlfriend. "Never knew how to handle feelings." He felt sad, but alone. He met Ann between dental school and oral surgery training and got engaged at age 29. His mother did not like her. She was jealous of the relationship and his mother stopped talking to him. He was estranged from his family, and they gradually drifted apart. His family either denies or pretends it did not happen and blames others. There were family issues that created tension. First Todd blamed his wife, "why can't you get along." Last time they saw the family was ten years ago. "It's been the three of us against the world." He then began to have problems with an employee and it went on for three years and was very stressful. In the course of this his health problems began. He experienced anger, especially directed at his wife and family. Cognitive behavioral strategies to help were recommended. On October 23, 2007, he was on Celexa 20 mg a day. He had mild anxiety, depression, negative cognitions, and sleep disturbance was moderate. Anger and irritability were severe. Family relationship problems, school and work problems were moderate. He was diagnosed with "distress in response to multiple psychosocial stressors." It appears that seasonal affective disorder was also discussed with Dr. Erickson. Issues in therapy had to do with the treatment seasonal affective disorder, complicated relationship between his spouse and parents. He had "unresolved family conflict. Consider readings on forgiveness." Procrastination and time management skills were noted. By December 4, 2007, they discussed cognitive behavioral strategies to improve mood and level of adaptive functioning." The next appointment was scheduled for January 8, 2008, although I do not see that any other appointments were recommended.

7.    I next reviewed the records from Gig Harbor Multicare Clinic. He was treated by Dr. Kramp. An adult intake history of November 1, 2006, noted hearing problems and past history of injury to neck, knees, or ankles. His father had had prostate cancer and heart disease. He had had a past history of right knee surgery. A diagnosis of tinnitus and hearing loss was noted on November 1, 2006. He was noted to be on Prozac 20 mg a day on December 6, 2006. Dr. Kramp noted the diagnosis of tinnitus, hearing loss and anxiety state (300.00). He prescribed Prozac 20 mg for that. It appears as though he was to be referred to Dr. Jesse Ang, Psychiatrist, on July 11, 2007. This, however, was not accomplished according to the records and he was referred to Rick Jennsen, Ph.D., May 23, 2007. At that time he had anxiety, not otherwise specified, symptoms, and insomnia. Prozac was discontinued on May 23, 2007, and he was started on Effexor up to 75 mg a day. Ambien was started. On May 23, 2007, Dr. Kramp noted that Dr. Erickson had sold his practice because he was unable to monitor patients with conscious sedation due to his hearing impairment and ongoing tinnitus. He had been angry about the loss of his practice and had increased insomnia, agitation, and feelings of anxiety. The Prozac was not helpful and made him more temperamental. He continued to be treated in 2008. Records indicate he went back on Fluoxetine 20 mg a day. In a note of June 30, 2008, "nothing has changed. He has been living between Florida and here. He has been looking into other work opportunities, but has not pursued anything." He states he has been wearing the hearing aid, but has not been pleased with it. Hearing has remained unchanged. He tried stopping the Prozac, but that was not tolerated. He states that he

seems to have a lot of pent up anger. He is very frustrated with the disability and his inability to work in his field. He finds that trying to study and work on other educational pieces has been difficult with the ongoing tinnitus. He finds it very difficult to concentrate. He states that he was worse off the Prozac. His wife feels that he needs some counseling. He is returning to Florida in six weeks and would like to establish a counseling relationship there. (June 30, 2008) On August 4, 2008, it appears that he was taking Prozac 20 mg daily (Fluoxetine) and melatonin 3 mg at bedtime. He was taking Fioricet one to two tablets every four hours as needed, and Motrin 800 three times a day. On December 12, 2008, medicines were the same.

8. I next reviewed the Harbor Audiology and Hearing Services records. I reviewed an included letter dated November 28, 2007, from Dr. Erickson indicating that he had gone on disability compensation "full compensation benefits" until age 65.

The note of Dr. Laura Day, doctor of audiology, to Dr. Brodkin indicated that pure tone and bone conduction testing revealed a mild to moderate, high frequency sensorineural hearing loss in the left ear and hearing within normal limits in the right ear. Speech reception thresholds are in good agreement with the pure tone averages. Word understanding ability was very good in both ears at the patient's most comfortable listening level. There has been a slight decrease in the higher frequencies, but at this time is not considered clinically significant. He will continue to monitor his hearing on an annual basis. It was also recommended he pursue neuromonics tinnitus treatment, as that has caused some significant stress for him and is quite debilitating.

9. I reviewed the Neural Consultants of Washington evaluation showing a normal MRI of the brain dated April 26, 2006.

10. I reviewed the records from Rhonda Savage, D.D.S.

11 I reviewed the records from Mary Simonson, M.D., with an intake that appears to be dated May 5, 2009. He was taking Prozac at the time, as well as Prevacid and Advil. Psychotherapy in May 2009 focused on cognitive behavioral strategies for management of tension in relationship with his wife. He was referred to Dr. Burns, M.D.'s book "Feeling Good Book." His irritability remained close to the surface. Diagnosis was major depressive disorder, single episode, moderate and bereavement and obsessive compulsive disorder (OCD). She increased the Fluoxetine to 40 mg a day. He was noted to be feeling better the next month. He had decreased irritability. He had improved sleep. Focus was on grief issues created by loss of former career. He was also working on interpersonal skills, assertiveness skills, and intimacy and trust issues especially in the relationship with his wife. His mood was "mostly neutral, fairly broad affect." He was to return to the clinic in three weeks. On July 8, 2009 "reviewed concerns over upcoming move to Chicago, struggles with verbalizing, expressing (?) to wife, wife feeling more anxious as separation nears. Wife also phobic about flying, concerned about family members flying, and being separated." He had some insomnia, but his mood was neutral and his affect was "broad." Assertiveness training reading was recommended. He had

some daytime sleepiness, possibly due to Fluoxetine.  He agreed to take Trazodone 25 mg at bedtime.  The depression was in partial remission.

On August 5, 2009, therapy issues were marriage and the relationship with his son, a career change, and medication issues.  He had had anxiety as the date for the move to Chicago approached.  He was sensitive to criticism and defensive regarding perceived criticism.  They were working on his perfectionism patterns and the difficulty with procrastination.  On August 5, 2009, Fluoxetine was discontinued and Lexapro 10 mg a day started.  He had decreased daytime sedation by August 29, 2009, and decreased irritability and decreased anger on the Lexapro.  His mood was neutral.  It was noted that he had obsessive-compulsive personality traits and bereavement issues regarding the hearing loss and the depression was in partial remission.  Lexapro was increased to 20 mg and Trazodone 25 mg at bedtime was prescribed.  He did not tolerate the higher dose of Lexapro and on October 16, 2009, it was decreased to 10 mg.  I do not see any treatment records following October 16, 2009.

12.   I reviewed the records of Dr. Mark Taylor.  He was seen for assessment of hyperopia, astigmatism, and presbyopia and given a glasses prescription.

13.   I reviewed the Tacoma Ear and Balance Clinic records from Charles Souliere, Jr., M.D.

14.   I reviewed the records from the Chicago Dizziness and Hearing Center.  He was seen there in 2009.  Chief complaint was tinnitus.  It appears that he was first seen on January 11, 2010.  Impression was noise induced hearing loss and tinnitus, greater on the left, disability, litigation, dyslipidemia, anxiety, and depression treated.  He had been referred by Dr. Brodkin. (Dr. Cherchi, M.D., Ph.D., Neurologist).  He cited attempted assessment done December 1, 2009, in their clinic by Jeanne Perkins.  She found that the tinnitus pitch matched to a frequency between 9 and 10 kHz and the intensity on the left side was 65-70 decibels.  The tinnitus was not successfully masked by white noise.  He was noted to be "pleasant and cooperative."  There are no abnormal mental status findings described.  Various recommendations were noted.  A trial of Betahistine was done January 11, 2010.  At the time of the evaluation, he was taking Fluoxetine 20 mg a day since May 2007 and Clonazepam 0.5 mg at nighttime since October 2009 for sleep.  Trazodone had not managed his sleep disturbance successfully.

He completed a Tinnitus Reaction Questionnaire (TRQ) on December 1, 2009.  He answered many items indicating that the tinnitus had made him tense, irritable, angry, annoyed, and depressed with difficulty concentrating and trouble relaxing, and the avoidance of noisy situations.  He had had interference with his sleep.  It was noted that he is back on Fluoxetine 20 mg a day and Clonazepam 0.5 mg at bedtime by December 1, 2009.

15.   Deposition of Mark Cardwell M.D. April 17, 2007.

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 11

16.     I reviewed the State of Washington, Department of Health, Dental Quality Assurance
        Commission, Statement of Charges.

17.     Dr. Peter F. Hampl DDS in his statement of March 17, 2010 noted the usual practice of
        oral surgeons consists of a minimum of three individuals on a a surgical team.
        Anesthesia guidelines were described. The use of the dental drills was described. He
        opined that oral surgery can be practiced safely despite hearing loss. He opined that Dr.
        Erickson could continue to practice oral surgery with the use of numerous mitigating
        steps.

18.     Records from Karen Nussbaum Ph. D. were reviewed. Dr. Erickson was referred by Dr.
        Tom Allen and therapy started December 11, 2009. He reported his loss of career,
        financial difficulty, loss of sense of identity as an oral surgeon. He reported poor sleep
        and impaired concentration and decreased mood. No abnormal mental status findings
        were described. He was participating in a 12 month fellowship with the ADA and was
        preparing for the LSAT. On January 7, 2010 he reported his "stoic Scandinavian family"
        everything was "superficial" or "glossed over". He reported he felt "damaged". He
        voiced some difficulty in concentrating for the LSAT exam preparation. Mood was
        dysphoric and somewhat agitated, affect was blunted. He was in bitter spirits by January
        14, 2010. Affect was tearful at times. He had a "negative orientation" that served as a
        barrier and his "core negative beliefs" were challenged. He was preparing for his
        deposition and the LAT in late January 2010. Perfectionistic tendencies, procrastination,
        and negative thoughts were the focus of treatment. Also improving communications with
        his wife was addressed. There were discussions about the confidentiality regarding his
        sessions and his legal case.

19.     I reviewed Dr. James Rock Ph.D. March 19, 2010 report concerning Dr. Erickson and
        published noise environment data concerning dental drills. He opined that the noise
        measurements made by the Washington industrial hygiene compliance officer Mr. Spann
        were consistent with published reports. "Based upon accepted hearing damage risk
        criteria the Micro Aire hand pieces do not produce enough noise to be associated with
        any excess risk of noise induced hearing loss."

20.     Excerpts from Forshey vs. SOMS were reviewed. Exhibits outline communications
        indicating stressors withing the surgical practice involving the legal case, personal
        problems and conflicts, and money concerns during 2004. There were staff complaints
        regarding the Ericksons. Staff considered the Ericksons to be abusive to Dr. Forshey.

21.     I reviewed Dr. Erickson's file with the Quality Assurance Commission.

22.     I reviewed excerpts from the report of Dr. Noel Weiss regarding hearing loss in dentists
        and the lack of documentation related to exposure to dental drills. There was "no support
        for the hypothesis that the noise levels to which dentist are exposed have the capacity to
        give rise to clinically evident hearing loss."

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 12

## DIAGNOSTIC IMPRESSION:

**Axis I:** In review of the data above, it is my opinion that Dr. Erickson probably has a chronic adjustment disorder, with irritability, and some anxiety and depression symptoms. This has ranged from moderate to mild and, with treatment, is in partial remission. He has been helped by Fluoxetine and Clonazepam medications. He has been helped with some cognitive behavioral therapy. His current treating psychiatrist, Dr. Simonson, has diagnosed major depressive disorder. Dr. Erickson's broader scope of symptomotology that includes maladaptive characterological coping mechanisms would support the diagnosis of chronic adjustment disorder. This was diagnosed previously by Dr. Richard Jennsen, Ph.D., who treated him in 2007. He had minimal clinical depression.

It is noted that he started taking medications prescribed by his family doctor, Dr. Kramp, on December 6, 2006. Since then, he has been on either Effexor, Lexapro, or Prozac, which he is taking now. He has been treated with Clonazepam in the past, later switched to Trazodone and Ambien for sleep, but most recently back to Clonazepam for sleep enhancement. Records indicate that the Fluoxetine and the Clonazepam have been beneficial.

Stressors related to his difficulties are his chronic tinnitus and mild hearing loss, vocational uncertainty and financial concerns and temporary separation from his wife and child. He has been overly dependent in his family relationship, as pointed out, "three against the world." He currently has an uncertain living environment, and the location of his future home will be dependent on the law school that he is accepted to. He currently has a home in Gig Harbor that is unsold. His son, apparently, is in Arizona with his grandparents, and his wife has been living in Chicago with Dr. Erickson, as well as visiting the son in Tucson. Dr. Erickson discontinued his surgical career, after multiple stressors in his practice and he complained of hearing loss and Tinnitus. Symptoms are subjective. There are conflicting professional opinions as to whether he could have continued to practice if he chose to. He previously had had social isolation from his family of origin for over ten years with conflicts between his wife and his parents. He had come from a family where feelings were not expressed openly, and his father coped with stress with alcohol. He had been noted to have obsessive and compulsive and perfectionistic type personality characteristics, with difficulty identifying and expressing emotions. He has a tendency towards being overly self-critical and sensitive to criticism and to become irritable. These preexisting

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 13

personality coping defenses are somewhat maladaptive when facing major life stressors or changes. One of the problems that Dr. Erickson complains of has been the irritability and sleep disturbance that he relates to the tinnitus. His preexisting and underlying temperament makes it more difficult for him to accept his physical problems and change of career.

**Axis II:**   Dr. Erickson has been described as having some obsessive-compulsive personality traits, perfectionism, sensitivity to criticism and probably is overly self-critical. He tends to suppress emotions and then becomes irritable. This has caused problems in interpersonal relationships. This has contributed to a slower recovery from adjustment problems than would otherwise be expected. This contributes to difficulties coping with chronic medical problems such as tinnitus.

**Axis III:**   Records indicate that he first noted bilateral tinnitus in January 2006. An MRI done in April 2006 was normal. He was thought to have had a noise-induced hearing loss by Dr. Souliere. Other opinion conflicts with this. Previously, he had had a problem with GERD, right knee surgery, and hernia repair. He apparently coped with this adequately as near as I can determine. His complaint is that his hearing impairment, and particularly the tinnitus, caused problems hearing and monitoring patients under anesthesia. However there is opinion that he could have mitigated this and continued to practice surgery.

He had previously had a problem with occasional migraine headaches. He stated that he had photophobia with this and not sonaphobia problems. He previously had had a mild cardiac arrhythmia, but this has not required treatment.

He has claimed that the tinnitus has caused constant ringing in the ears leading to decreased ability to concentrate, work, and read, and it has affected his ability to study. He gets tired. Records also indicate that medications prescribed to him have caused some daytime lethargy, and there has been an effort to find a medicine that does not produce this.

**Axis IV:**   Dr. Erickson comes from a family where his father was a practicing general dentist. He was described to Dr. Jennsen as being a functional alcoholic. He would get angry and had trouble talking about emotions and problems.

Dr. Erickson reportedly had a speech impediment as a child and was shy. He started using alcohol at age 15. He used alcohol to cope with adolescent and early adulthood emotional distress. He met his wife at age

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 14

29. His mother did not care for his wife and basically stopped talking to him. Subsequently, there has been over a 10 or 11 period where Dr. Erickson has not spoken with his family of origin. He describes his family as "three of us against the world." In addition, he had had a problem with an employee, as described above, and a lawsuit was filed that was not resolved until 2007. There had been personel conflicts between the office staff and the Ericksons.

He had the onset of his hearing problems in 2006, and this led to discontinuing his practice on April 29, 2007. He has been on disability (definition of disability "his own occupation"). Financially, he receives $15,000 a month disability payments. He has also been accepted to the Hillenbrand Fellowship through the ADA. He receives a $75,000 a year stipend from that. He stated in his deposition that he had been able to sell his practice for $950,000. Unfortunately, he has not been able to sell his house in Gig Harbor. He moved to Chicago in September 2009, and his son has mostly resided in Tucson, Arizona, with the grandparent. He is 16 years old, is an avid golf player, and is pursuing training in Tucson. His wife commutes between Chicago and Tucson, but is currently living, at the time of deposition, in Chicago with Dr. Erickson.

Dr. Erickson, reportedly, has been doing well in his fellowship. This is a non-clinical fellowship. He has been studying pre-law and just took the Law Scholastic Aptitude Test. He has applied to several law schools, and it is uncertain as to where he will be living in the future.

**Axis V:**    As near as I can determine, Dr. Erickson is functioning at a GAF scale score of 70-75. He had previously, before successful treatment, had a GAF scale score of 60. Items that have been addressed in his recent therapy are inclusive of his medical issues, his career change, his relationship with his wife and son, and his legal case. As near as I can determine, he has been active pursuing his studies that are fairly rigorous and demanding. He has not had impairment in general activities of daily living. He has had multiple stressors, aside from the tinnitus and hearing problems. He is involved in litigation stress at the present time.

## RECOMMENDATIONS:

Dr. Erickson has a good prognosis for continued improvement of his symptoms of irritability, anxiety, and moodiness. As his living environment becomes more stable and as his family is reunited, he is expected to have a decrease in anxiety and irritability. His sleep would be expected to improve. When his lawsuit is resolved, further improvement will probably occur with a lessening of anxiety and stress. He may need to be maintained on medications. His current medications (Fluoxetine or Lexapro and Clonazepam) are certainly appropriate for his

Robert Todd Erickson and Ann Erickson
March 16, 2010
Page 15

problems. He will probably be able to eventually taper off the medication, once his living location, career direction, and family stability are improved. Further cognitive behavioral therapy in large measure would be directed to personality coping mechanisms which preexisted his Tinnitus and hearing loss and which contribute to depressive feelings and irritability independent of his Tinnitus.

John E. Hamm, M.D.
Psychiatrist

JEH/pt

Enc.: 1. My Curriculum Vitae.
2. List of cases in which I have testified as an expert, by trial or deposition, in the past four years.
3. Compensation statement (at this point I have billed $350 per hour for 12 hours work equaling $4200).

**EXHIBIT 6**

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

9

10  JENNIFER N. FORSHEY, D.M.D., M.D.,

                 Plaintiff,

11

    vs.

12

SOUND ORAL & MAXILLOFACIAL

13  SURGERY, P.S., a Washington corporation;
ROBERT TODD ERICKSON, DDS, and

14  ANNE ERICKSON, and their marital
community;

15

               Defendants.

No. C06-5335RJB

DECLARATION OF ANNE ERICKSON
IN OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT

16

17      I, ANNE ERICKSON, testify under penalty of perjury under the laws of the State of

Washington that the following is true and correct to the best of my knowledge.

18

19      1.    I am over the age of 18, I am competent to testify and I make this declaration

based on my personal knowledge.

20

21      2.    I have read and reviewed Genie Morgan's August 25, 2004 Declaration.  On or

about the day Dr. Forshey was terminated, I asked Ms. Morgan to reduce to writing all the

22

things she had been telling me for the past six to seven weeks about Dr. Forshey's behavior.

23

FORSBERG & UMLAUF, P.S.
ATTORNEYS AT LAW
1019 PACIFIC AVENUE • SUITE 814
TACOMA, WASHINGTON 98402
(253) 572-4200 • (253) 627-8408 FAX

# EXHIBIT 3

# SEPARATION AGREEMENT AND RELEASE

This Separation Agreement and Release ("Agreement") is entered into by and between JENNIFER FORSHEY, D.M.D., M.D. ("Forshey") and SOUND ORAL & MAXILLOFACIAL SURGERY, P.S., a Washington professional service corporation ("Sound Oral").

## RECITALS

1.    Forshey is, and has been at all times relevant hereto, employed by Sound Oral pursuant to an Associate Agreement dated March 1, 2004 ("Associate Agreement") and Sound Oral's Employee Handbook.

2.    Sound Oral and Forshey have mutually agreed to terminate their relationship under the Associate Agreement, and they desire to resolve amicably all issues arising from Forshey's employment and separation from employment with Sound Oral.

## AGREEMENT

The parties acknowledge the foregoing and agree as follows:

1.    **Resignation of Employment**.  In lieu of termination, Sound Oral has offered Forshey the opportunity to resign with severance.  Forshey has elected to accept this offer and resign pursuant to the following timing/payment plan: (a) Forshey will resign her employment effective August 19, 2004; (b) Sound Oral will pay Forshey her normal salary through August 31, 2004; and (c) Sound Oral will pay Forshey monthly payments of $5000 for each of October, November and December of 2004, with such monthly payments being paid on the 15ᵗʰ of each such months. Forshey's continued receipt of the payments discussed herein is contingent on her continued compliance with the terms of this Agreement.  The payments made by Sound Oral to Forshey will be referred to herein as the "Severance Payment" and will be subject to withholding and taxes as set forth in Section 2.

The parties agree that this separation is deemed a termination pursuant to Section 13 of the Associate Agreement and that Sound Oral has given appropriate notice of termination as required by the Associate Agreement.  Further, the parties agree that Sound Oral has acted in accordance with its Employee Handbook, a copy of which was acknowledged received by Forshey on February 21, 2004.

2.    **Severance Payment**.  As a portion of the consideration for this Agreement and the release of claims herein, Sound Oral agrees to pay Forshey the

1008726

Severance Payment, less applicable taxes and withholdings. The Severance Payment shall be paid in accordance with Section 1, but in no case will any payment be made prior to Forshey's execution and delivery of this Agreement in accordance with Section 7 below. Sound Oral agrees to provide Forshey with notice of her opportunity to continue group health insurance coverage under COBRA starting with September 1, 2004; however, Forshey understands that any payments made under COBRA are her sole responsibility. Forshey agrees that the severance sum set forth above is an amount to which she has no legal entitlement or is the product of compromise of disputed claims and is therefore a sum to which Forshey would not be entitled had she not entered into this Agreement. Forshey agrees that she is not entitled to any other payments other than those set forth in Sections 1 and 2, including but not limited to, payments relating to accrued and unpaid vacation (or paid time off), bonus amounts, or business incentives discussed in the Associate Agreement (including all amounts accrued prior to the date of this Agreement or accruing subsequent to the date of this Agreement).

3.     **Covenants Remain in Effect**. Forshey agrees and understands that she remains bound by the terms of Sections 12 (Restrictive Covenants) and 10 (Confidential Information) of the Associate Agreement, which was executed for valid consideration by Forshey at the time of execution.

4.     **Release of Claims.** In exchange for the consideration set forth in this Agreement, Forshey hereby forever releases and discharges Sound Oral and its past and present officers, directors, shareholders, agents, predecessors, successors, assigns or any other person acting on its behalf from any and all claims, known or unknown, suspected or unsuspected, arising out of Forshey's employment with Sound Oral or the separation thereof. Without limiting the foregoing, this release shall include any claims arising under any state, local, or federal law regulating employment and/or discrimination in employment, including without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans With Disabilities Act and the Washington Law Against Discrimination. This release shall also include, without limitation, the release of any claim arising out of or relating to any alleged express or implied contract, any of Sound Oral's policies or procedures, or which claim alleges wrongful discharge, constructive discharge, retaliatory discharge, racial discrimination, disability discrimination, age discrimination, marital status discrimination, unpaid wages, unpaid compensation, emotional distress, or any other claim which could have been brought against Sound Oral arising out of Forshey's employment with Sound Oral or the separation thereof.

5.     **Non-Disparagement**. Forshey agrees in exchange for payment of the sum set forth in Section 2 above, that she will not in any way disparage Sound Oral, its officers, directors, shareholders, employees, customers, patients, clients, or any other party affiliated with Sound Oral.

HH  000002

1008726

6. **Agreement not to File Claim.** Forshey agrees not to file any legal action of any kind related to or which arises from her employment with Sound Oral or the separation thereof, provided, however, that Forshey may pursue a claim for unemployment compensation following the date of her separation of employment. Forshey agrees that she will not prosecute, allow to be prosecuted on her behalf or participate in any precluded legal action of any kind arising out of or relating to her employment with Sound Oral or the separation thereof. Forshey agrees that she will not voluntarily testify in, provide information or otherwise participate in any legal matter against Sound Oral.

7. **Review Period**. Forshey has been offered the opportunity to review a copy of this Agreement for a period of up to 5 business days and to consult with counsel of her own choosing regarding the terms and conditions of this Agreement. Following Forshey's review and acceptance of this Agreement, Forshey will sign and return this Agreement to Sound Oral's counsel at Harlowe & Hitt LLP, One Tacoma Avenue North, Suite 300, Tacoma, WA 98403. This Agreement will become effective on the date that Forshey signs the Agreement (the "Effective Date"). Should Forshey sign this Agreement before the end of the 5-day review period, Forshey thereby agrees to waive her right to the 5-day review period, and by signing this Agreement, the 5-day review period shall be waived.

8. **Confidentiality Clause.** Forshey agrees to hold all of the terms and conditions of this Agreement strictly confidential. Sound Oral agrees not to disclose, publish, utter, reveal or otherwise publicize the reasons underlying Forshey's resignation or that the resignation was in lieu of involuntary termination, except to those who have a need to know, including, but not limited to Sound Oral officers and directors, outside attorneys, accountants or other consultants. Forshey agrees that she shall not disclose, publish, utter, reveal, or otherwise publicize any of the terms of this Agreement, the amount paid in severance, or any of the discussions, correspondence, or matters which occurred or arose during the negotiation of this Agreement, except that Forshey may disclose the terms of the Agreement to her immediate family, attorney of record, and her accountant or tax consultant to the extent necessary to comply with tax obligations or other financial obligations imposed by law upon such persons' agreement to be bound by this confidentiality provision. Either party may also disclose this Agreement in any legal action to enforce this Agreement and Forshey may disclose the Agreement if directed to do so by final order of a court with jurisdiction over her.

Forshey further acknowledges that, in the course of her employment with Sound Oral, she has acquired and used confidential information of a special and unique nature relating to such matters as clients, patients, business plans and relationships, trade secrets, systems, methods, procedures, manuals and confidential reports, of Sound Oral, as well as personal and financial information relating to Sound

HH 000003

Oral, its directors, officers, shareholders, agents, employees and clients (collectively called the "Confidential Information"). As a material inducement to Sound Oral to pay Forshey the consideration described in Section 2, Forshey will not, at any time, directly or indirectly, for any purpose whatsoever, disclose any Confidential Information, whether or not such information is the subject of any prior agreement between Forshey and Sound Oral. In the event of a breach or threatened breach by Forshey of this provision, in addition to and not in limitation of all other rights, remedies or damages, at law or in equity, Sound Oral is entitled to temporary restraining orders, and to both preliminary and permanent injunctions, in order to prevent any breach by Forshey or any person acting for her.

9.      **Sound Oral Property**. As a further material inducement to Sound Oral to pay Employee the consideration described in Section 2, Forshey represents that she has returned to Sound Oral all property of every kind, nature and description, wherever located, that came into her possession or control during or as the result of her employment with Sound Oral.

10.     **Non-Admission of Liability or Wrongdoing**. The parties acknowledge that this Agreement is entered into to avoid the expense and disruption of any litigation or dispute resolution process. Neither the preparation for review, nor the execution of this Agreement shall constitute an admission by any party of any liability or wrongdoing of any kind. This Agreement shall not in any way be construed as an admission by any party that any party has acted wrongfully with respect to any other party or any other person or entity or that any party has any rights whatsoever against any other party.

11.     **Attorney Fees**. In the event that suit is brought by either party to enforce any provision hereof, the court shall award to the prevailing party its attorney fees and costs, including those on appeal(s).

12.     **Entire Agreement.** This Agreement contains all the promises and covenants exchanged by the parties. This Agreement supercedes and replaces any alleged prior agreements or understandings, if any, between the parties regarding the subject matter of this Agreement, except that both parties agree that the covenants set forth in Sections 10 and 12 of the Associate Agreement remain in effect and survive this Agreement. The provisions of this Agreement are severable and if any part of this Agreement is found to be unlawful or unenforceable, the other provisions of this Agreement shall remain valid and enforceable to the maximum extent possible under applicable law. Forshey acknowledges that she has been advised to have this Agreement reviewed by legal counsel of her own choice. In executing this Agreement, each party warrants that she or it is relying solely upon her or its own judgment and knowledge and that she or it is not relying on any statements or representations made by any other party or its agents. This Agreement constitutes the entire agreement between the parties concerning the matters referred to herein.

HH 000004

13.    **Voluntary Execution.**  The parties acknowledge that each party has executed this Agreement freely, knowingly, and voluntarily. The parties each represent and warrant that each party has read and understands this Agreement.

14.    **Assigns.**  This   Agreement   shall   bind   the   heirs,   successors, representatives, and assigns of each party.

15.    **Governing Law**.  This Agreement shall be governed by, interpreted, construed and enforced under the laws of the state of Washington, regardless of the domicile or residence of any party hereto.

16.    **Effective Date.**  This Agreement shall be effective as set forth in Section 7 above.


JENNIFER FORSHEY, D.M.D., M.D.          SOUND ORAL & MAXILLOFACIAL
                                        SURGERY, P.S., a Washington
                                        professional service corporation


_____

Date: _____          By_____
                                        Title_____
                                        Date_____


STATE OF WASHINGTON)
                   )ss.
County of Pierce   )

On this day personally appeared Jennifer Forshey, who executed the within and foregoing instrument and acknowledged to me that she signed the same as her free and voluntary act and deed for the purposes therein mentioned.

Given under my hand and official seal this____ day of _____, 2004.


_____

_____
(Type/Print Name)
Notary Public in and for the State of Washington,
residing at _____.

My appointment expires: _____.


HH  000005

1008726